## THE PEOPLE vs. McDANIELS.

A robbery may be committed by extorting personal property, from the person or in the presence of the owner, by means of threats of an unfounded criminal charge, where such property is obtained through fear produced by such threats.

Where, by means of a threat to arrest the prosecutor, on a charge of having been guilty of the crime against nature (the charge being groundless and known to be so to the defendant), the prosecutor, through fear of such threatened arrest, was induced to deliver to the defendant $20 and a receipt for $13 owed by the defendant to the prosecutor, and to promise to pay the defendant $20 more, *held,* that the defendant was guilty of robbery in the second degree.

It is *not necessary to constitute such offence* that the charge against the prosecutor should be direct or should be made in unequivocal language. It is enough if the language used was intended to communicate such a charge and was so understood at the time by the prosecutor.

The prisoner was indicted for robbery in the first degree, against the form of the statute. (2 R. S. 677, § 55.) The indictment also contained a count for robbery in the second degree The prosecutor Russell Skeele, testified that he was 67 years old, and had resided in Sudbury, Vt., for 37 years, and that he had been acquainted with the prisoner for three or four years. From his testimony, which was long and minute, it appeared that in June preceding the trial, the prisoner came to the stable,

The People *v*. McDaniels.

where the prosecutor had one of his mares to be curried, and found the prosecutor with his pantaloons unbuttoned to make water, and it so happened that a milk stool stood behind the mare. The prisoner as he came into the stable observed, " How is this, Uncle Russell? What does this mean? A mare, a stool and a man with his trousers unbuttoned. A story might be made of it that would hurt you." The prosecutor explained the matter, and the prisoner said he was satisfied, that nothing improper had been done or intended by the prosecutor.

On a subsequent occasion the prisoner alluded to the same transaction, and observed that the prosecutor could be injured by it, conveying the idea that the facts would warrant the belief that the prosecutor had connection with the mare. The prosecutor asked him if *he* intended to injure him? "Oh no," said the prisoner, " I only meant that some persons might injure you by it."

The prosecutor testified that the prisoner alluded to it again, afterwards. He also testified that the insinuation was entirely groundless. On one occasion the prosecutor informed the prisoner that he, the prosecutor, was going on the 21st August to Ohio and Michigan to see his sons, and was going to carry about five hundred dollars to aid them in discharging incumbrances from their land, and that he then wanted the sum of thirteen dollars from the prisoner, which the latter owed him for money lent. The prisoner promised to pay by the day, but failed to do so.

On the 21st August, the prosecutor left home early in the morning, came to Whitehall and took passage in the boat which was to leave the next morning on the canal, and went to bed, on board. About midnight he was awaked by the captain, who informed him there was a man on deck who wished to see him. He got up and went out, and there met the prisoner, who said he had some business with him and desired him to accompany him to the public house. They left the boat together, and after traveling some distance (30 or 40 rods), no one being in the street — the inhabitants in bed — the prisoner

stopped and told the prosecutor to hand him $500. The prosecutor denied that he had over $300 with him. The prisoner told him he must give him $250 cash and his note for the same amount, or go back and suffer, for he had got a man with him to assist in taking him back. The prisoner also insisted that the $13 note should be given up. After parleying for some time they went to the tavern, and the prosecutor escaped from the prisoner, but was overtaken. The prosecutor said to the prisoner, what do you mean in demanding money of me in this way? I had as lief you had put a pistol to my head and demanded it as to demand it in the way you are doing it. Do you think it right to take my money from me in this way? The prisoner replied that he felt perfectly clear in doing it, for his God had told him to take $500, for it would not distress the prosecutor or his family, as he owed no body, and if he obtained the money he would go off and not trouble him any more. The prisoner then told the prosecutor he must do it immediately or he should take him back — that he had a man ready with a horse and wagon, and I should suffer. The prosecutor declined, and the prisoner said, it seems you had rather suffer than part with your money, and if you must suffer, you must suffer. The prisoner then walked off a few steps and beckoned as if to some person. The prosecutor was much frightened and called the prisoner back, and said stop, Mr. McDaniels, don't destroy me, don't hurt me. The prisoner returned, and the prosecutor agreed to let him have what he had in his wallet, which was $20, and give him a receipt to cut off the $13 note, and agreed to pay $20 more on his return, and prisoner agreed not to hurt him or his family, and to say no more about it.

The prosecutor swore that he believed the prisoner, in his threats, had reference to the charge insinuated against him, of having connection with the mare in Vermont, and that he parted with his money out of fear of being taken back and prosecuted in Vermont on that charge. That he was in feeble health, a stranger in Whitehall, and was exceedingly alarmed

Some other corroborating testimony was given

The People *v*, McDaniels.

The prisoner's counsel moved for his discharge, on the ground that the proof was insufficient, but the court refused to grant the motion. They then demurred to the evidence.

The court intimated that a demurrer to evidence was unusual in criminal cases. That the party demurring must not only admit the facts proved, but also all the facts which could be legally and properly inferred from them. The counsel being unwilling to do this, withdrew the demurrer and addressed the jury.

*Crary*, for prisoner.

*Allen* (Dist. Att'y), for the People.

WILLARD, Circuit Judge, after recapitulating the evidence and reading the statute definition of robbery in the first and second degree (2 *R. S.* 677, § 55, 56), said: If the jury believe that the prisoner intended to communicate to the prosecutor the idea that he was to be taken back to Vermont, on a charge of having had sexual connection with his mare, unless he delivered his money, and the prosecutor parted with his money through fear of that charge being made against him when taken back to Vermont, the offence amounts to robbery in the second degree.

The prisoner did not, in explicit terms, make any direct charge against the prosecutor; nor is it necessary that he should do so, in unequivocal language, or in any particular form. It is enough if the language he used was intended to communicate such a charge, and was so understood at the time by the prosecutor.

The jury found him guilty of robbery in the second degree, and he was sentenced to state prison for six years and six months.

NOTE.—See 1 Leach's Cr. Cases, 278; 1 Russ. & Ryan, 145, 375, 408.